If we may, please. My name is Justin Lum. I represent the respondent, sorry, the petitioner, Samuel Sentosa. Your Honor, I believe there are two questions. There are, of course, two issues in this case. One is, was there a frivolous asylum application filed and could the BIA have to have affirmed the trial court in making that finding? And two, of course, whether the trial court should have granted a point of removal. Should the BIA, therefore, have overturned that decision from the trial court? Now, as to the first issue, as to the frivolous asylum application, now, as Your Honors are aware, there's four requirements for the frivolous asylum application. That the applicant have notice of the consequences, that the board or the immigration judge make specific findings, that the applicant knowingly filed, and those findings are supported by proponents of the evidence. And lastly, that the applicant had an opportunity to account for any discrepancies. Now, in this case, Your Honor, the petitioner specifically feels that the findings were not supported by proponents of the evidence. As is stated in Yen v. Holder, which was cited by the government, the applicant must have deliberately fabricated a material element of the application. Didn't your client admit that he filed a fraudulent application for asylum? Well, Your Honor, yes. But as stated in Kodka, the fact that it's a fabrication of material evidence does not necessarily constitute fabrication of a material element. Now, there were additional statements. There was some puffery and embellishments in his original application. However, even in his amended affidavit, upon which the trial judge determined his case the second time around, he still stated incidents which were in his original application. In addition, there was not any issue about any fabrication of any documents that were presented. Furthermore, one important factor is that the judge on the second go-around did not find him not to be credible. Had she found him not to be credible, then she would not have then granted the withholding of removal. And yet she still granted him withholding of removal despite a frivolous finding, a frivolous asylum application finding. In the second go-around, did you offer a more recent country conditions report? Well, Your Honor, the petitioner was improper. He was unable to find another attorney. His previous attorney had withdrawn. What was the group, right? Pardon? His prior attorney was not part of that group. What was the group that helped him? No. It wasn't the Chinese? It was not. Okay. No, his prior attorney was different from that Virginia group. Okay. But she apparently withdrew the hearing before, so he did not have any assistance. So I'm not sure I heard an answer to Judge Ward's last question, which was did your client submit any new country reports in the second go-around? No, he did not. All right. Go ahead, please. Now — Well, why not? Because isn't that one of the problems with the BIA's decision is it failed to address country conditions? Well, Your Honor, I would argue that, number one, country conditions are not in and of themselves determinative of whether an individual — whether or not a grant of asylum or withholding of removal is appropriate, whether country conditions have changed. It's — you know, many times I have — it's been argued that it's really the country conditions at the time, at the time of the filing, that are supposed to be used. Secondly — So in this case, do you mean the country conditions as of the time of the initial filing or the second go-around? As the initial — as the initial filing. All right. Now, secondly, I believe that, you know, this Court, at that — this Court in 2000 — in 2009, 2010, decided Wakari and Tampa belong. And this Court, in those cases, did state that there is violence against Christians in Indonesia, at which time it applied withholding of — it said that disfavored group analysis applies to withholding of removal as well as asylum, both for Chinese Christians but also for Christians in general. Counsel, is the CAT claim at issue in this appeal? I don't believe the CAT claim is at issue. It's only withholding of removal and the asylum. Now, again, the government has stated that it's a substantial evidence standard, but it is actually a preponderance of evidence standard for determination of a frivolous asylum application. And given that — But when we review, we review to determine if substantial evidence supports the agency decision, don't we? Well, yes, Your Honor. But in order to determine whether there's a frivolous application, the Court should have applied whether there was a preponderance of the evidence. In the immigration court, you mean? Or the BIA in review. And, Your Honors, you don't believe that. In this case, there's a preponderance of the evidence present. Not only, as I said, the amended statement still states incidents that happened to him. There's no change. He did testify that the Virginia company changed things and threatened him. There was, again, no finding of adverse credibility by the judge. And what's very important in this is that the judge, in the end, granted withholding of removal. So if the judge granted withholding of removal, then there was a belief on her part that — on the immigration judge's part — that this individual was credible. This individual had suffered persecution. Maybe not to the extent of a general past persecution standard, but at least under the disfavored group analysis. Now, the government has argued that — now, I'm sorry, the BIA stated, as far as withholding of removal, one of their grounds was, of course, that withholding of — that the disfavored group analysis didn't apply to a withholding of removal situation. And in this case, we know now that, of course, it does, based upon this Court's finding, it will carry and tabulam. So obviously, if the Court found that it was — that Mr. Sentosa was credible and that he did suffer some persecution, then it stands to reason that there was not — the preponderance of evidence standard was not met. And the frivolous application file, it should not have been found. So if we were to remand — I'm still hung up on the country conditions because I think they are relevant. If we were to remand, do you have authority either way as to whether the BIA can consider current country conditions? Is it prohibited from it, or is it allowed to consider the current country conditions? No, it can consider the current country conditions. Okay. And since your client has admitted that the first version of the asylum claim was largely fabricated, why did you repeat it in the brief? Your Honor, that was — when we repeated — that was just a recitation of the facts as they happened. We recited it, and then after, we stated that in that previous one. Those weren't the facts, though, right? Those are fabricated facts. Some of them, yes. But we — in the brief — in the brief, we referenced the facts as they were provided. We were just relating his testimony at the first hearing. Because after that, it then follows and says that he then later admitted that some of the information was fabricated. All right. Counsel, you've got about — Well, just briefly on the withholding and removal, again, Your Honor, the judge found him to be credible. So, therefore, withholding and removal should have been granted. Again, the government claimed that — I thought you wanted to reserve two minutes, and you now have 21 seconds. Oh, I'm sorry, Your Honor. Okay. Good morning, Your Honors, and may it please the Court. I'm Michael Heiss on behalf of the Respondent, the Attorney General of the United States. The agency in this case properly concluded that the Petitioner knowingly filed a frivolous asylum application, and substantial evidence supports the agency's decision — the Board's decision to deny him withholding and removal. The real issue here, which counsel addressed, is that — whether or not there was a material fabrication here. And what we have is the issue that past persecution is a material element of an asylum claim. And we have clear admissions that Mr. Sentosa knowingly fabricated, or at least knowingly adopted, fabrications of events that happened to him. Now, he suffered unfortunate events. There's no question that these things happened. The immigration judge accepted his credibility as to incidents, but those incidents in reality — Did the I.J. accept the credibility finding? It did. It did. So why — what was the reason the V.I.A., in essence, overruled the I.J.'s determination that withholding should have been granted? Specific to withholding, the immigration judge pretty clearly incorrectly applied the withholding standard, or the disfavored group analysis, as applies to withholding of removal claims. Part of the reason for that is that the immigration judge's decision predated this Court's decision in Wakari, which clarified exactly how withholding works in the disfavored group analysis. I mean, you look at the immigration judge's decision, page 86 — administrative record, page 86, quote, the same standard applies for withholding as applies to asylum for Chinese Christian cases. Judge's decision at 95, sale, sets a — that's this Court's previous decision in sale, sets a relatively low standard for ethnically Chinese Christians from Indonesia to qualify for asylum and withholding of removal. Sale analysis, same page — excuse me, 96. Sale analysis applies equally to withholding as it does to asylum. What this Court stated in Wakari is not that it doesn't apply. It's actually — I believe my counsel suggested that the board suggested that disfavored group analysis does not apply in withholding. And that is not at all what the board said here. It does apply. It's just you have to show more — Exactly. As this Court stated in Wakari, it's a — I believe a — we'll need to adduce — a withholding applicant will need to adduce a considerably larger quantum of individualized risk evidence to prevail on a disfavored group claim than an asylum applicant. So what we have here is an immigration judge that essentially applied the asylum standard to a withholding claim despite having found that the applicant filed a frivolous asylum application. So that — that was clear error on the immigration judge's part, just misapplication of the controlling standard. And then, considering the evidence as presented before the immigration judge, which the board is entitled to do, it concluded that the facts as presented just simply did not rise to the level of past persecution and also did not satisfy the larger quantum of individualized risk evidence to substantiate a withholding claim. Did the BIA, though, adequately address the country conditions in order to assess the pattern or practice issue? Well, this Court has consistently stated that there is no pattern or practice of persecution of ethnically Chinese Christians in Indonesia, and that was — Wakari pretty clearly stated that. But doesn't the BIA still have to address the country conditions? I mean, we've said it, but, you know, we've taken into account the country conditions at the time. Certainly. The board is reviewing the case, as this Court is reviewing the case, based on the record that's before it. If the Court is concerned that the country conditions were substantially different in 2008 as compared to 2007, remand perhaps would be appropriate in that instance. I haven't heard any suggestions. And then if that happened — well, I'm suggesting. Sure, sure. If that happened, would the board be able to be free to consider the current country conditions? Well, I believe so. I mean, what the Court was discussing earlier, and I believe my counsel, co-counsel, suggested that — or opposing counsel, I should say — that the agency should consider country conditions as of the time of filing. And yes, those are relevant, but the asylum and withholding standard is really forward-looking. It's based on what's going to happen in the future. We're talking about future harm. So it would be apt for the agency to consider the most recent country conditions. And it routinely does. It will take judicial notice. This Court has taken judicial notice of country conditions. I want to ask you the same question that Judge Rollinson asked opposing counsel, which is, is CAD an issue at all in this case? I don't believe it was raised on appeal. I'd have to confirm in the brief, I guess at that point, Respondent's brief to the board. So that would be a failure to exhaust at that point. But also, it wasn't raised in his brief to this Court, so that would be waived for failing to raise it. If the Court is concerned about that, of course, it can remand. The agency would have to have the opportunity to address that in the first instance. But I don't believe that is before the Court. In your brief in footnote 8, as I understood it, you indicated that the board assumed that the petitioner was a member of a disfavored group in the decision. And I was wondering if you could point me to where in the decision you see that that actually occurred. I could grab it. Right. That would be great. Because I went and I looked at the pages that you were citing, 7 through 9 of the board's decision, and I had trouble seeing where the board made that assumption. Court's indulgence. Certainly. I looked through the same pages myself. And I say that because even if the board made that assumption, wouldn't it have to look at the level to which the group was disfavored in order to determine the degree of individualized risk that needed to be established by this particular petitioner? Level of disfavor. As I saw it in the case law, it's a bit of a tradeoff in that the more a group is disfavored, the less an individualized risk needs to be established. And if I'm wrong, certainly. No, no. This type of case, the ethnically Chinese Christian individual in Indonesia is a relatively routine case that the agency sees with significant frequency. So I'm not sure that it would necessarily get into that level of detail in this kind of case. There are other disfavored groups. This particular disfavored group has been extensively discussed. This Court actually, I believe, has at least four public decisions discussing the nature of this particular disfavored group and whether or not it satisfied the pattern of practice claim, which it stated it has not, or established a pattern of practice of persecution. That was Wakari, and I believe it was endorsed and repeated in Tempe Bolon subsequently to that. I'd like to turn back to the frivolous application, if I may. I'm not sure there's any dispute that we have admitted falsehoods here. You crossed out. The problem, you know, I'm just troubled by the fact that, you know, you went to this group. What was it called? The Chinese Indonesian American Society, who was for help, and they ended up changing its story. And what's happened to this group, first of all? They have been heavily prosecuted.  Many of the individuals involved are, I believe, still in prison for engaging in immigration fraud. But isn't he somewhat of a victim of the group? I would agree, the Respondent would agree he's a victim, had he not testified under oath about these events. He did that because he thought he was supposed to, but then he also came clean later and said he was a victim. He did come clean later, but there's still no question that he endorsed. He adopted under oath with counsel seated next to him. But that counsel now is gone. Once they discovered the falsehoods, once the counsel was apprised that his client had essentially lied to him. Okay. The counsel withdrew once the motion to reopen was granted in 2007. The Department of Homeland Security filed the motion to reopen in 2007, based on CIIS having been prosecuted for numerous immigration fraud acts. But what we have here are substantial variations between what actually happened and what he claimed happened originally. What Your Honor is talking about is threat. That's typically basically a duress defense. But that still requires that the individual have no reasonable alternative in that situation but for or but to do the thing that subjects him to a negative consequence. Typically it's a criminal case, but here we have a frivolous asylum application. So if you have a frivolous asylum application so he doesn't get asylum. Correct. But he's still eligible for withholding in cap, right? Correct, Your Honor. The regulation ACFR 1208.20 specifically states that a frivolous asylum application finding does not preclude an individual from seeking withholding. So he was certainly eligible to pursue it, but based on the facts that are the real facts as to what happened to him, those are, you know, while they're unfortunate, those are relatively minor in comparison to what needs to be shown. Persecution is an extreme concept. And withholding is even more extreme. Exactly. Exactly, Your Honor. Yes, it's a much higher standard. And especially given the forward-looking nature of this, it's pertinent to realize that his family has remained in Indonesia unharmed for several years. He actually returned to Indonesia for several months voluntarily while his visa was still valid. So those factors substantially undermine his claim, the reasonableness of his claim. But under the pattern or practice prong, isn't the BIA required to look at the country conditions? I'm not sure. I mean, it's not fair to say they didn't. There is a country conditions report in the record. Right, but they didn't even discuss it. I'm looking at the Board's decision here, which is extensive. Yeah, it is. But we do presume that the Board looked at all the evidence. Correct, Your Honor. Yeah. I don't see it specifically mentioning the country conditions. So, yeah, what he says, what they say is that the Respondent has adduced no new documentary evidence pertaining to country conditions since the prior. I'm not sure the Board is obligated to reach out to grab. Well, no, they're saying that he did not introduce. They're criticizing him for doing that. For failing to provide more. Right. And it just, I mean, the Board certainly, I don't know if that's a failure to attorney or. Well, I believe, in any event, the burden is on Mr. Sentosa to establish the validity of his claim for protection, rule of protection. Certainly, the Board could have looked at the country conditions report. I'm not certain there were any substantial changes between the two. I think it was a 2007 report and a 2008 report. I'm not sure there are. It was a 2001, wasn't it? The original application was 2003, and then the motion to reopen was 2007. The one I have in my record is 2001, I think. Okay. 2001. Okay. Well, if the Court is concerned that there are substantial changes between 2001 and 2008, or even now, it would certainly be wise to remand for consideration of that as to whether or not that affects his claim. But ultimately, under the facts as presented, and under these circumstances, I would believe remand would be futile, given that, again, his family has remained there without incident. He voluntarily returned. The Indonesian government has made concerted efforts to, as this Court has recognized, to contain this. He voluntarily returned? Yes. So he is in Indonesia. I'm sorry. At one time. Oh, okay. I believe he's still here. Okay. In August of 1999, he returned. Okay. And then he came back to the United States in January of 2000. So he was gone for several months without incident, I might add. I'm well over my time. Yes, you are. Thank you. The Court has no further questions. Thank you. Thank you very much. You can have two minutes. Thank you, Your Honor. Your Honor, mainly two, I won't need that much time, but mainly two points, Your Honor. The first is, as far as country conditions, at that time, it was actually the government who usually presents the changing country conditions at that hearing. But is it the government's burden to do so? Typically, if it's not the, at that time, it usually was required the government would present them. What would require the government to do that if the petitioner was seeking the relief? Well, I'm sorry. Go ahead. Generally, the government is also trying to put down the most recent conditions. And I would have to say, Your Honor, it's usually because the government feels that the country conditions would favor them. Generally speaking, when you read a Department of State country conditions, it always seems to say that, in general, the country is trying to do its best and the government is trying to improve the situation. But you have to read into it to see the things that are actually happening. And they're not always, country conditions are not always accurate. But at least, so the government normally places that in evidence. I don't know if, in this case, because he's an individual and he was a pro se, that the government felt, well, we don't have to worry about it, so we're not going to do it. But at that time in 2008, it usually would be the government that would present the petition. Was he pro se at the time of the second hearing? Yes, Your Honor. At the time of the second individual hearing, he was pro se. And if you read the transcript, it basically states that. The second point, Your Honor, is something that Your Honors alluded to. As far as the individual being a victim, this is not somebody who's sophisticated. He's not an attorney. When he comes to the United States and he's looking for assistance for asylum, then he goes to an organization which he thinks will help him. When they tell him, you have to go, we've written this, you have to go with it, we know where your family is, don't do anything. Don't make waves. But we can't sanction that kind of conduct. I mean, if we send the message that, you know, you can go along with fraud and then, you know, it's okay as long as you tell us you've been threatened, the whole system would collapse because then nobody would be compelled to tell the truth. They'd make up the best story they could and then say they were threatened if they didn't do, didn't present that story. That's really difficult for me to endorse, that concept. Well, I agree that in the general sense. If I were just to make up a story, go to somebody, make up my story, and then just submit this. But in this case, as he testified, he presented them with a statement. Those incidents that, which he included in his amended affidavit, an affidavit they submitted the second time, they were still included in that statement. But he did have instances of things that actually happened to him where he did actually, these acts occurred against him. It's not a situation where he just said, I want asylum, you know, company, can you please just say all of these things and just, I don't really have anything, just drop something for me and then I'll just sign it. You know, again, he stated he was contrite. He talked to his pastor about it. He, you know, he could have taken, maybe if he had taken the route and not said anything at court and just continued to argue that it was valid, then even with the frivolous finding, or maybe you could argue that, well, those statements are still true. You know, it's ironic that if he argues that, no, none of those were lies, then perhaps there's no frivolous finding. Whereas now, instead, because he is honest, he's honest with the government. He's honest at court. Now he's basically dinged for it. It also sends a message that, look, if you're involved with something and somebody's done something, if you don't know any better, then you just have to stay with whatever they tell you. Because if you do come around and you do tell the truth, then you are going to be the one that suffers. You're going to suffer from this. In this case, you know, he has a U.S. citizen wife. He has a U.S. citizen child. A frivolous asylum application finding means that he cannot adjust at all. Obviously, he is not able to have any immigration benefits. So, you know, in this case, you have a victim. You have a victim of a system that is now just, it's, you know, it's just piled on him. Thank you, Your Honor. Thank you very much, counsel.
judges: Gleason, Wardlaw, Rawlinson